UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *vs.* | ) | CAUSE NO. 1:81-cv-448-RLY-KPF |
| | ) | Consolidated |
| CBS CORPORATION, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| THE CITY OF BLOOMINGTON, | ) | |
| INDIANA, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *vs.* | ) | [Cause No. 1:83-cv-009-RLY-KPF] |
| | ) | |
| CBS CORPORATION, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| SARAH ELIZABETH FREY, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *vs.* | ) | [Cause No. 1:00-cv-660-RLY-KPF] |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY and CBS | ) | |
| CORPORATION, | ) | |
| Defendants. | ) | |

**ENTRY ON THE UNITED STATES' MOTION TO ENTER THE AGREED
AMENDMENT TO THE CONSENT DECREE PROVIDING FOR REMEDIAL
ACTIONS AT NEAL'S LANDFILL, LEMON LANE LANDFILL AND
BENNETT'S DUMP**

(This Entry applies to Cause Nos. 1:81-cv-448-RLY-KPF and 1:83-cv-9-RLY-KPF)

1

Before the court is the United States' Motion to Enter the Agreed Amendment to the Consent Decree Providing for Remedial Actions at Neal's Landfill, Lemon Lane Landfill, and Bennett's Dump (the "Remaining Sites"). The motion formalizes the remediation plans for the three Remaining Sites and comprehensively resolves all outstanding non-remediation issues among the parties regarding all six contaminated sites that have been the subject of this litigation for decades. For the reasons explained below, the court approves, and will issue, the proposed Amendment to the Consent Decree.

## I.   Background

The factual and procedural background of these cases has been previously explained in decisions of this court and the United States Court of Appeals for the Seventh Circuit. *Frey v. EPA*, 403 F.3d 828 (7th Cir. 2005) ("*Frey II*"); *Frey v. EPA*, 270 F.3d 1129 (7th Cir. 2001) ("*Frey I*"); *Schalk v. Reilly*, 900 F.2d 1091 (7th Cir.), *cert. denied*, 498 U.S. 981 (1990); *City of Bloomington v. Westinghouse Electric Corp.*, 824 F.2d 531 (7th Cir. 1987); *Frey v. EPA*, Cause No. 1:00-cv-660-RLY-KPF, Entry on All Pending Summary Judgment Motions, 2008 WL 696009 (S.D. Ind., March 11, 2008); *Frey v. EPA*, Cause No. 1:00-cv-660-RLY-KPF, Entry on Defendants' Motion to Dismiss, 2006 WL 2849715 (S.D. Ind., Sept. 29, 2006); *United States v. Westinghouse Electric Corp.*, Cause No. IP-83-9-C, Ruling on Motion to Dismiss Third-party Complaint, 1983 WL 160587 (S.D. Ind., June 29, 1983). The court therefore provides only a brief background as foundation for the present motion.

From 1958 to 1972, CBS (formerly Westinghouse Electric Corp.) operated a plant in Bloomington, Indiana, where it manufactured electrical capacitors containing an insulating fluid composed of polychlorinated biphenyls ("PCBs"), which are hazardous substances within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). CBS disposed of defective capacitors at local dumps and landfills, resulting in the release of PCBs into the environment. In addition, CBS discharged PCBs from its plant through the sewer system to the Winston Thomas Sewage Treatment Plant ("Winston Thomas").

In the late 1970s, harmful levels of PCBs were detected in streams, sediments, plants, and wildlife around the Bloomington area, which were traced to CBS' plant and to six sites – Lemon Lane Landfill, Neal's Landfill, Bennett's Dump, Anderson Road Landfill, Neal's Dump (located in Owen County), and Winston Thomas. In 1981 and 1983 respectively, the Plaintiffs – the United States, the State of Indiana, the City of Bloomington, and Monroe County ("Plaintiffs") – brought the present two lawsuits under CERCLA to compel clean-up of the six sites.

In 1985, after extensive litigation, CBS entered into the Original Consent Decree with the Plaintiffs that required CBS to clean up the six sites. A central feature of the Original Consent Decree required CBS to dig up all soil within the confines of each site, down to bedrock, and burn the excavated material in a high-temperature incinerator to be constructed and operated by CBS.

3

Despite the approvals of the local, state, and national governments to the remediation scheme, elements of the public opposed the plan for incineration. Opposition continued in the years after issuance of the Original Consent Decree, as the plans for the incinerator and other remediation work were being finalized and interim clean-up and containment steps were being implemented, at significant expense to CBS and the Plaintiffs. This opposition to the incinerator culminated in the early 1990s with the passage of several bills by the Indiana legislature that were designed to delay, and eventually to preclude, construction of the incinerator, in part by preventing state and local issuance of the required construction and operation permits.

In February 1994, the parties filed with the court a set of principles "to guide the process of exploring alternative remedies" to replace those set forth in the Original Consent Decree. These principles, known as the Operating Principles, provided for additional studies of the sites and, if the parties agreed upon an alternative remedy, the parties would present the alternative remedies to the court as an amendment to the Original Consent Decree or other legal instrument.

From 1994 to 1999, with the assistance of the Special Master, the parties agreed upon alternative remedies for three of the six sites covered by the Original Consent Decree – Winston-Thomas, Neal's Dump, and Anderson Road Landfill. Three Consent Decree Amendments memorializing these agreements were approved by the court in

1997, 1998, and 1999[1], respectively.  The parties also made progress towards cleanup of the Remaining Sites – Lemon Lane Landfill, Neal's Landfill, and Bennett's Dump – but were unable to reach agreement on final alternative remedies for those sites until they negotiated the proposed Amendment until now.

The parties approached the clean-up of the Remaining Sites in stages or "operable units," with each unit to be incorporated in a formal Environmental Protection Agency ("EPA") Record of Decision ("ROD") and presented to the court as an amendment to the Original Consent Decree.  The first stage, or "source control operable unit," addressed PCB contamination within the "fill" areas of the former landfills.  The purpose of this operable unit was to prevent people and wildlife from coming into direct contact with PCB-contaminated waste material and to minimize the migration of PCB-contaminated groundwater from these sites.  After soliciting and responding to public comments, EPA selected the alternative source control operable units for the Remaining Sites in three separate ROD amendments issued on October 16, 1998 (Bennett's Dump), March 29, 1999 (Neal's Landfill), and May 12, 2000 (Lemon Lane Landfill).  CBS completed all three source control operable units by the end of 2000, as required by an order issued by the court on February 1, 1999.

---

[1] Although the parties have never amended the Original Consent Decree with respect to Anderson Road Landfill, CBS excavated and removed all wastes from the Anderson Road Landfill and stored the waste at an Interim Storage Facility ("ISF") at Winston-Thomas.  CBS closed the ISF in accordance with a court order issued on November 25, 1997.

The second and third operable units, which CBS will implement under the proposed Amendment, will address PCB contamination in groundwater, surface water, and sediment at or related to the Remaining Sites. The purpose of these operable units is to prevent people and wildlife from coming into contact with PCB contamination in streams located near the Remaining Sites. The PCBs have migrated to these streams through conduits in the bedrock beneath the former landfills. Each of the Remaining Sites is located over water-soluble limestone bedrock, which is known as "karst." The movement of groundwater through cracks and fissures in the bedrock has caused the karst bedrock to dissolve and, over time, resulted in a network of underground streams, caves, and sinkholes. The drainage in such topography is largely subterranean. Thus, after PCBs were dumped at the sites over 30 years ago, some of the PCBs quickly migrated into the fractured bedrock, which contains PCBs to this day. Groundwater flowing through the bedrock transports the PCBs to nearby springs.

From 2006 to 2007, EPA published for public comment three proposed plans to address PCB contamination in groundwater, surface water, and sediment. Risk assessments completed by EPA showed an unacceptably high risk of noncarcinogenic health effects in humans who might consume fish contaminated with PCBs, as well as an unacceptably high risk of reproductive impairment in mink and kingfishers that live along stream corridors. Consequently, EPA proposed additional remedial measures to reduce the mass of PCBs released in nearby springs and decrease the concentration of PCBs in

fish.  After receiving public comments, EPA selected the second and third operable units in three separate ROD amendments issued on September 26, 2006 (Bennett's Dump), September 29, 2006 (Lemon Lane Landfill), and September 25, 2007 (Neal's Landfill).

In January 2008, the parties reached a settlement on all remaining issues in these cases and filed with the court their proposed final Amendment to the Consent Decree, which included the remediation work at the three Remaining Sites and comprehensive, non-site-specific terms such as financial responsibility, termination conditions, and reopener provisions.  The proposed Consent Decree Amendment then underwent formal EPA administrative notice, comment, and adoption and, in March 2009, the government filed the present motion for approval of the Consent Decree Amendment.  In April 2009, CBS filed a memorandum in support of the motion, and the *Frey* Plaintiffs,[2] while not parties to the remediation cases, filed a statement opposing approval at this time.

## II.    Summary of Terms

The Amendment provides that all terms of the Original Consent Decree continue in effect unless changed or superseded by the proposed Amendment.  Below is a summary of its terms.

---

[2] *Frey, et al. v. United States Environmental Protection Agency and CBS*, 1:00-cv-660-RLY-KPF, is a citizens-suit challenge to the excavations (first operable units) at the three Remaining Sites.  On July 16, 2008, the court consolidated the *Frey* case with 1:81-cv-448-RLY-KPF for case management purposes only.

The most obvious change made to the Original Consent Decree is that all contaminated material will not be excavated: some will remain at the Lemon Lane Landfill and Neal's Landfill Sites, under landfill caps, with water and sediment treatments added to capture and treat continued PCB run-off.

Remediation for each of the three Remaining Sites is governed by an EPA ROD and its implementing Statement of Work, which specify the water treatments, sediment removals, and continued monitoring and testing to be done at each site (operable units two and three), all of which are incorporated into the Consent Decree Amendment.

The Amendment expands the geographical boundaries of the Remaining Sites to include springs and seeps where CBS will perform remedial measures.

**A.     Lemon Lane Landfill**

Lemon Lane Landfill is a former sanitary landfill located to the northwest of the City of Bloomington.  In accordance with the source control ROD Amendment issued by EPA in May of 2000, CBS has already excavated and removed "hot spots" from the former landfill where PCB concentrations in the soil exceeded 50 ppm (parts per million) on average.  This work involved the excavation of over 80,087 tons of PCB-contaminated "hot spots" and 4,402 capacitors, which CBS transported to hazardous waste disposal facilities in Michigan and Texas.  CBS consolidated 40,000 cubic yards of remaining material under a landfill "cap," which consists of, among other things, six inches of

8

topsoil, eighteen inches of granular fill, and a geomembrane that is impervious to water. The former landfill now spans nine acres and is surrounded by a fence.

Upon approval of the Consent Decree Amendment, CBS will assume ownership and operation of, and will expand, the water treatment plant that EPA built in 1996 at Illinois Central Spring ("ICS") (about one-half mile away).  EPA estimates that, as expanded, the plant will remove over 99% of the mass of PCBs released into Clear Creek, above the current 70% removed by the existing interim plant.  CBS will be required to operate the plant until the groundwater emerging from ICS for a 12-month period has a PCB concentration equal to or less than the PCB effluent limit of 0.3 ppb.

In accordance with the Lemon Lane Landfill ROD Amendment for Operable Units Two and Three, the proposed Amendment requires CBS to extend the effluent line for the treatment plant by approximately 1,000 feet so that the treated water discharges beyond a sinkhole in order to prevent re-entry of treated water into the contaminated bedrock.  CBS will also extend the capture system to include three additional small springs and convey this water to the ICS treatment plant for treatment; remove contaminated soils and sediments from certain defined areas within the site to specified concentration standards; and conduct periodic sampling of domestic wells within a 5,000-foot radius of the site and within the hydrogeological zone of influence of the site.

**B.     Neal's Landfill**

Neal's Landfill is a former landfill that is located approximately five miles west of the City of Bloomington. In accordance with the source control ROD Amendment issued by EPA on March 29, 1999, CBS has already excavated "hot spots" from the former landfill where PCB concentrations exceeded 500 ppb. This work involved the excavation and removal of 41,747 tons of PCB-contaminated material and 4,119 capacitors, which CBS transported to hazardous waste disposal facilities in Michigan and Texas. CBS consolidated the remaining waste under a landfill "cap" which reduced the size of the landfill from 18 to 10 acres.

The proposed Amendment requires CBS to implement the remedial action selected by EPA in the Neal's Landfill ROD Amendment for Operable Units Two and Three. CBS will modify and operate a groundwater collection and treatment system that will capture and treat a large part of the total mass of continuing discharges of PCBs to surface waters from springs and seeps near Neal's Landfill. An existing groundwater collection and treatment system, which CBS constructed in 1989 as part of the interim remedial measures required under the Original Consent Decree, captures PCB-contaminated groundwater released from previously identified springs and seeps and conveys the captured groundwater to a treatment plant that is able to treat up to 500 gallons per minute. Under the proposed Amendment, CBS will be required to modify and expand the collection system to capture discharges of groundwater from previously unidentified seeps. CBS will be obligated to continue operating the treatment plant until groundwater

10

emerging from these springs and seeps has a PCB concentration equal to or less than the PCB effluent limit of 0.3 ppb for a 12-month period.

The expanded collection system will be able to capture all flow rates up to 450 gallons per minute.  Based upon a CBS-developed computer model, EPA determined that capacity should be sufficient to reduce PCB concentrations in fish below the target concentrations determined by EPA to be protective of human health and the environment.  However, because the predictive accuracy of CBS' model is uncertain, the proposed Amendment includes a Remedy Confirmation Clause, under which CBS may be required to implement additional remedial measures selected by EPA in the event the PCB concentrations in fish do not decline as predicted by the computer model.

The proposed Amendment also requires CBS to conduct a removal of PCB-contaminated sediment and soil along Conard's Branch stream.  The removal must achieve a PCB cleanup standard of 1 ppm on average for PCBs in stream sediment and 5 ppm on average for PCBs in flood plains.  In the event the soil or sediment becomes recontaminated with PCBs at a concentration greater than these clean-up criteria, CBS must conduct another removal, unless CBS can demonstrate that the recontamination is not contributing to PCB concentrations in fish greater than the target value set by EPA to protect human health and the environment.

### C.    Bennett's Dump

11

Bennett's Dump is located in an abandoned limestone quarry one mile to the northwest of the City of Bloomington, and occupies three acres adjoining a small stream known as "Stout's Creek."  As part of the source control ROD Amendment issued by the EPA in October 1998, CBS fully excavated the site, achieving an average residual PCB concentration of 25 ppm, which is EPA's standard cleanup criterion for low-use/industrial property.  In total, CBS removed 36,172 tons of material and 1,756 capacitors and covered the site with a twelve-inch soil cover.  CBS also excavated 10 cubic yards of sediment from adjoining Stout's Creek.

The Amendment also requires CBS to implement the remedial action selected by the EPA in the Bennett's Dump ROD Amendment for Operable Units Two and Three. The remedial action will take place in two stages.  The first stage centers on the installation of a passive drain system to lower the water level in several rain-filled quarry pits around the site.  Because these pits currently recharge the groundwater that feeds nearby springs and seeps, lowering the water elevation in the pits will reduce, if not eliminate, on-going releases of PCB-contaminated groundwater from springs and seeps. The second stage of the remedial action includes the design, construction, and operation of a new treatment plan and collection trench.  The latter would cut deep enough into the bedrock to intercept any remaining discharges of PCB-contaminated groundwater into Stout's Creek and convey such water to the treatment plant.  CBS would be required to operate the treatment plant until the groundwater emerging from these springs and seeps

12

at the site has a concentration equal to or less than the effluent limit of 0.3 ppb for a twelve-month period.

### D.    Terms Common to the Remaining Sites

Pursuant to the proposed Amendment, CBS is required to conduct periodic samples of domestic wells within a 5,000-foot radius of the boundaries of, and within the hydrogeological zone of influence of, each site.  If PCBs are detected, CBS is required to provide an alternative potable water supply.

CBS is to continue appropriate maintenance of the sites.  This maintenance includes periodic inspection of the landfill caps, mowing the grass, the application of herbicides and the removal of deep-rooted plants so as to prevent penetration of the landfill caps, and groundwater monitoring.

### E.    General Terms

CBS will pay $6,669,000 to the United States within 30 days of entry of the settlement in reimbursement of a portion of the response costs incurred by the United States in connection with the sites.  In addition, CBS shall pay $1,881,000 to the United States for natural resources damages within 30 days of the entry of settlement.  These amounts are in addition to the Original Consent Decree's requirement that CBS pay $1,000,000 to the United States for reimbursement of expenses it incurred in connection

with Neal's Landfill, Neal's Dump, Bennett's Dump, and Lemon Lane Landfill.

In exchange for CBS' performance of its obligations under the proposed Amendment, the Plaintiffs promise not to assert claims against CBS for specified matters described in the "Covenant Not to Sue" with respect to the Remaining Sites. This convenant, which is based upon the Covenant Not to Sue in the Original Consent Decree, is effective upon entry of the proposed Amendment, but is subject to a reservation of rights that would allow the United States to seek further response actions, or to recover additional costs, from CBS under specified conditions. Under this "reservation of rights" provision, the United States may assert future claims for injunctive relief and cost recovery with respect to releases (or threatened releases) resulting from "previously unknown or unforeseen conditions that arise or are discovered after the entry of this Amendment." After EPA certifies completion of the remedial action with respect to a particular site, the United States may only exercise this clause with respect to conditions that arise or are discovered after EPA issued the certification.

The proposed Amendment retains the language from the Original Consent Decree with respect to CBS' waiver of claims against the United States, except that CBS has agreed to broaden the waiver to include claims under Section 106(b)(2) and 113 of CERCLA. CBS also covenants not to sue the United States or other government Plaintiffs for breach of contract or any other violation of the Original Consent Decree arising prior to the entry of the proposed Amendment. CBS, however, reserves the right

14

to sue the State of Indiana for breach of the Original Consent Decree in the event that the United States takes any civil or administrative action to seek additional relief under the "reservation of rights" provision or the "Remedy Confirmation Clause."

## III.    Standard of Review

Approval of a consent decree is a judicial act that is committed to the sound discretion of the district court. *Madison County Jail Inmates v. Thompson*, 773 F.2d 834, 845 (7th Cir. 1985); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir.), *cert. denied*, 537 U.S. 942 (2002). Courts, however, should exercise this discretion in a limited and deferential manner, as the fairness of a settlement is "a matter best left to the negotiation between the parties." *Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 834 F.2d 677, 681 (7th Cir. 1987).

In general, public policy strongly favors settlements of disputes without litigation. *Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1985); *United States v. BP Oil Exploration & Oil Co.*, 167 F.Supp.2d 1045, 1050 (N.D. Ind. 2001); *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1337-38 (S.D. Ind. 1982). "[T]he limitations of judicial competence and the desirability of encouraging out-of-court settlements in order to lighten the judicial caseload create a presumption in favor of approving the settlement." *Donovan*, 752 F.2d at 1177. The public policy favoring settlements "is particularly strong where a consent decree has been negotiated by the

15

Department of Justice on behalf of a federal agency, like the Environmental Protection Agency, which enjoys substantial expertise in the environmental field." *BP Exploration*, 167 F.Supp.2d at 1050 (citing *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991)).

In reviewing CERCLA consent decrees, in particular, the court determines "not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *United States v. Cannon Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990); *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991). Thus, in evaluating whether to approve a consent decree settlement, the court considers the following four factors: (1) fairness (both procedural and substantive), (2) reasonableness, (3) consistency with applicable law, and (4) the public interest. *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3rd Cir. 2003); *BP Amoco Oil PLC*, 277 F.3d at 1018; *United States v. Davis*, 261 F.3d 1, 23-28 (1st Cir. 2001); *BP Exploration*, 167 F.Supp.2d at 1051-54; *Seymour Recycling Corp.*, 554 F.Supp. at 1337-42.

**IV**.   **Analysis**

    **A.**   **Fairness**

        **1.**   **Procedural Fairness**

Procedural fairness requires that the parties' settlement negotiations be conducted

16

in good faith and at arm's length.  "A court should 'look to the negotiation process and attempt to gauge its candor, openness and bargaining balance.'" *In re Tutu*, 326 F.3d at 207 (quoting *Cannons Eng'g Corp.*, 899 F.2d 79 at 86); *BP Amoco Oil*, 277 F.3d at 1020; *Davis*, 261 F.3d at 23.

The court finds the proposed Amendment is procedurally fair because it was negotiated at arms-length and under the supervision of the court-appointed Special Master.  None of the comments from the public present any facts from which the court could infer otherwise.  One commenter did note that the negotiation of the Original Consent Decree was tainted by an alleged conflict of interest because an attorney that represented the EPA in the negotiation of the Original Consent Decree allegedly left EPA after the entry of that settlement to work for a law firm that had represented the City of Bloomington in the same negotiations.  As there is no suggestion that the former EPA employee had any role whatsoever in the discussions that led to the proposed Amendment, the court finds the commenter's concerns without merit.  (*See* Docket # 40, United States Response to Public Comments, Government Ex. 2 ("Government Ex. 2") at 72-73).

## 2.    Substantive Fairness

"'Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally

17

responsible.'" *BP Amoco Oil*, 277 F.3d at 1020 (quoting *Cannons Eng'g*, 899 F.2d at 87). The court will uphold the terms of the settlement so long as "the measure of comparative fault on which the settlement terms are based is not arbitrary, capricious, and devoid of a rational basis." *In re Tutu*, 326 F.3d at 207.

The court finds the proposed Consent Decree Amendment is substantively fair because CBS, the legally responsible party, will bear the entire cost of conducting an alternative cleanup that EPA has determined will provide adequate protection of human health and the environment. As previously discussed, the proposed Amendment will require CBS to incur the cost of implementing remedial measures to address PCB contamination in groundwater, surface water, and sediments. EPA has valued the costs of the remedial measures over the next 30 years to be approximately $15 million. This cost is in addition to the source control work CBS has already implemented, which EPA valued at $50 million. In addition, the proposed Amendment includes a Remedy Confirmation Clause for Neal's Landfill, which assures that CBS will perform additional response actions at that site if currently defined remedial measures do not achieve projected reductions in containment levels. Further, the proposed Amendment reserves the right of the United States to seek additional relief if an unknown or unforeseen condition results in the release, or threatened release, of hazardous substances, and such release or threatened release presents an imminent and substantial endangerment to human health or the environment. Finally, CBS will pay $6,669,000 to reimburse EPA

for past response costs and pay $1,881,000 to compensate the public for natural resources damages.

## C.     Reasonableness

In evaluating the reasonableness of the proposed Amendment, courts have identified a number of factors that may be considered, including: (1) the nature and extent of potential hazards, (2) the technical adequacy of the cleanup, (3) the availability of viable alternatives, and (4) the extent to which the consent decree reflects the relative strengths or weaknesses of the government's case against the defendant. *B.P. Exploration*, 167 F.Supp.2d at 1053; *Seymour*, 554 F.Supp. at 1339.

### 1.     Nature and Extent of Potential Hazards

In selecting the original remedy in 1984, EPA concluded that the sites must be fully excavated because it believed the PCB-contaminated waste left on site would be mobilized through "backflooding" – a phenomenon that occurs during large storms when runoff floods conduits in the bedrock, causing groundwater to reverse its ordinary flow. EPA feared that this backflooding would cause PCBs to migrate into the groundwater system.  Based upon hydrogeologic information that was generated after the entry of the Original Consent Decree, however, EPA now knows that water material can be safely left on site.  Peizometric (water elevation) monitoring shows that the consolidated waste is not coming into contact with groundwater.  At Lemon Lane Landfill, the piezometers

indicate that water levels have always been below the base of the waste materials.  At Neal's Landfill, only one of five piezometers has shown significant groundwater, but the water in the piezometer has been consistently below the consolidated waste since September 2003, and continues to drop.  Based upon these facts, EPA has concluded that backflooding is not a concern at the Remaining Sites.

Another area where EPA's knowledge has improved since the Original Consent Decree concerns the impact of PCBs upon nearby streams.  For example, EPA now knows that PCBs are being released into ICS.  Moreover, EPA now knows that the removal of the PCBs from the "fill" area of the former landfills, as required by the Original Consent Decree, will not stop the releases of PCBs into the surface streams.  Investigations have shown that the releases are fueled by PCBs that have migrated into nearby streams into the bedrock below the sites.  Therefore, PCBs would continue to be released into nearby streams even if CBS were to remove all the soil down to the bedrock surface.

EPA represents that it has conducted site-specific risk assessments for each of the Remaining Sites to determine threats to human health and the environment resulting from ongoing releases of PCBs to surface water, and has concluded that the releases pose high risks to people and to wildlife that may come into contact with the contaminated streams.  Thus, the purpose of the settlement is to abate ongoing releases of PCBs to surface water by removing PCB-contaminated soils and sediments in and near the affected streams, and

restore and replace natural resources that have been injured as a result of the releases. These measures – save some sediment removal at Neal's Landfill – were not included in the Original Consent Decree.

Commenters have objected to several aspects of the proposed Amendment.  First, some commenters are troubled by the fact that CBS will not be removing "all material" from the Remaining Sites as required by the Original Consent Decree.  These commenters fear that PCBs left on-site at Lemon Lane Landfill and Neal's Landfill, above the karst geology and without a bottom liner, pose a continuing threat to the environment as the PCBs emerge from streams, springs, and seeps.

The commenters concerns misapprehend the purpose of a remedial action under CERCLA. The National Contingency Plan ("NCP") does not require complete removal of all hazardous substances from the environment regardless of risk, nor does it require EPA to include within its risk assessments the effects of pollutants released from other sources in the region.  Rather, the NCP provides that remedial action should "adequately protect human health and the environment . . . from unacceptable risks posed by hazardous substances, pollutants, or contaminants present at the site."  40 C.F.R. § 300.430(e)(9)(iii)(A).

Here, there is no evidence that PCBs at the Remaining Sites pose risks to persons or wildlife at any location other than along the stream corridors where PCBs continue to

be released.  In fact, the Agency for Toxic Substances and Disease Registry conducted a public health assessment in connection with the PCB sites at issue in the 1990s and concluded that "the general populations of Bloomington and surrounding areas are either not being exposed to PCBs and other site-related contaminants or are not being exposed at levels that would be expected to produce human body burden sufficient to cause adverse health effects."  (Government Ex. 2 at 36-37).

Second, the commenters also note concern with other contaminants from the Remaining Sites, including dioxin and furan (which were commingled with the PCB waste), as threats to human health and the environment.  The United States' Response to Public Comment No. 8 addresses this concern, and reflects that sampling data from the Remaining Sites over the past 20 years show that dioxin and furan contamination is not driving the risk to human health and the environment.  The most recent sampling conducted by the EPA's contractor, after PCBs were removed from the Remaining Sites (but before landfill caps were installed as part of the source control operable units), confirmed that dioxin-furan contamination was at least an order of magnitude lower than the cleanup level set by the EPA to protect human health and the environment from dioxin and furans.  (*Id*. at 16-19).  Thus, the remedial actions performed by CBS not only abated risks posed by PCB contamination at the sites, but abated risks posed by dioxin and furan at those sites.

Finally, the plaintiffs in the *Frey* litigation assert in their public comments[3] that the EPA's procedures for evaluating site risks were defective. They argue, as they do in *Frey*, that the EPA failed to conduct a remedial investigation and feasibility study ("RI/FS"), or the functional equivalent thereof, in contravention of the NCP.

The court addressed this argument in its Entry on Pending Summary Judgment Motions in the *Frey* case, and found that EPA was not literally required to comply with the RI/FS requirement set forth in the NCP at 40 C.F.R. §§ 300.430(d), (e). (Docket # 53, Entry on Pending Summary Judgment Motions at 14). The court explained that the EPA must demonstrate only that the primary purpose of the RI/FS was accomplished at some point prior to, or as part of, the ROD Amendment process. (*Id.* at 16). As noted in the United States' Response to Public Comments, the administrative record for each of the

---

[3] The *Frey* plaintiffs also filed a Statement and Advice to the Court (Docket # 48), in which they ask the court to decide the merits of their citizens-suit challenge prior to deciding the present motion to enter the agreed Amendment. Their primary concern is the risk of inconsistent remedies. In other words, if the court were to award them the relief the *Frey* plaintiffs seek, the remedy the *Frey* plaintiffs are awarded may conflict with the remedy provided for in the Amendment and approved by the court. CERCLA contemplates, however, that citizens-suit challenges commence only after completion of the remedial action. *See* 42 U.S.C. § 9659(a); *Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir. 1990) ("The obvious meaning of this statute [42 U.S.C. § 9659] is that when a remedy has been selected, no challenge to the cleanup may occur prior to completion of the remedy."). Thus, while this case is the unusual case, the court finds the *Frey* plaintiffs' concerns insufficient to delay the court's approval of the Amendment given the parties' present circumstances. Indeed, the governmental Plaintiffs' shared funding of the water-treatment systems, particularly ICC, is likely exhausted. (*See* Docket # 49, Motion for Expedited Status Conference, ¶ 7 ("It is anticipated that the monies previously contributed by the parties to fund [ICC] will be exhausted before the end of May 2009."). Upon the court's approval of the Amendment, however, CBS will assume full operation and maintenance of the sites and will assume the funding of the cleanup. The court finds these circumstances outweigh the *Frey* plaintiffs' concerns.

Remaining Sites contains a number of documents that, when taken together, are the functional equivalent of an RI/FS.  (*See id*. at 3-5 (documents for each Remaining Site listed in a table)).  Specifically, these documents reflect that the EPA completed the functional equivalent of an RI for each site by: (1) characterizing the nature and extent of the contamination, (2) identifying application and relevant and appropriate requirements, and (3) preparing a risk assessment.  The EPA also completed the functional equivalent of a FS by explaining how it identified various remedial alternatives, and then selecting a response action based upon an analysis of the nine evaluation criteria set forth in the NCP.  (*Id*. at 3).

Moreover, in May 2000, the EPA Ombudsman Office examined this issue, and determined that the EPA and its site manager were "doing a commendable job consistent with the [NCP]," and that "RI/FS equivalent analyses have been performed prior to the remediation presently occurring at applicable [operable units]."  (*Id*. at 6).

For the reasons set forth above, the court finds the proposed Amendment adequately addresses the nature and extent of potential hazards posed by PCBs.

2.      **Techical Adequacy of the Proposed Amendment and the Availability of Remedial Alternatives**

In selecting the original remedy for the site in 1984, the EPA determined that the unique geology of the sites prevented consideration of traditional methods of remediating

24

groundwater contamination, such as pumping contaminated groundwater from the ground and cleaning the water at a water treatment plant.  As a result, in selecting alternative remedial measures, the EPA decided to concentrate on preventing groundwater contamination from reaching human or other biological receptors by capturing it when it emerges to the surface and routing it to water treatment plants.

### a.       Commenter's Objections

Commenters posed a number of objections relating to the technical adequacy of the proposed remedy.  Three of the objections are addressed below.

First, commenters object to the Amendment on grounds that it fails to address the risks of airborne PCB releases from uncovered streams, seeps, springs, water treatment facilities, and airborne releases through landfill caps.  In response to concerns about air emissions from the Remaining Sites, the EPA evaluated potential risks from such emissions and concluded that the risks are well within acceptable ranges.  Air sampling at the water treatment plant at ICC showed an average PCB concentration ranging from 0.011 to 0.185 micrograms per cubic meter of air.  As discussed in the United States' Response to Comments, the EPA reviewed this data and concluded that nearby residents or persons visiting the facility would have no significant cancer or non-cancer risk as a result of exposure to these observed concentrations.  (*Id*. at 27-28).  Air samples from Lemon Lane Landfill and Neal's Landfill showed concentrations that were lower than

those detected at the water treatment plant at ICC – the equivalent of .03 micrograms per cubic meter of air.  (*Id*. at 26-28).  Finally, there is no risk of PCB air emissions from Bennett's Dump because CBS did not consolidate waste material at that site, and the springs at the site contain much smaller quantities and lower concentrations of PCBs than at the other Remaining Sites.  (*Id*. at 28).

Second, the commenters note concern with airborne PCBs and their ability to be absorbed by plants that later enter the food chain.  In the United States' Response to Comment 16, the United States reported that Dr. James Chapman ("Dr. Chapman"), an ecologist, used data collected from air monitors around the perimeter of ICC from April 7 to 19, 2002, to calculate the accumulation of airborne PCBs by leafy vegetables and legumes under worst-case scenarios where the plants are assumed to grow immediately adjacent to the treatment plant.  (*Id*. at 29-30).  Even under these assumptions, Dr. Chapman determined that the cancer risk from eating vegetables from a garden adjacent to the ICS property was 2 individuals in 100,000.  (*Id*.).  Dr. Chapman concluded that these cancer risk estimates are well within EPA's acceptable risk management range of 1 individual in 10,000 to 1 individual in a million.  (*Id*.).  Dr. Chapman also calculated the non-cancer risks to people, including children, from eating vegetables from a garden adjacent to the ICS property and concluded that non-cancer risks were not significant. (*Id*.).

Third, the commenters note concern that contamination in the groundwater might

26

be released from springs or seeps that are presently unknown or undiscovered.  In the United States' Response to Comment 13, the United States represents that the EPA and CBS have studied and catalogued the hydrogeology and geology of the Remaining Sites sufficient to support the EPA's remedial actions.  (*Id*. at 22).  As discussed in the United States' Response to Comment No. 13, the EPA has essentially ruled out the possibility that contamination in the groundwater is migrating to springs and seeps other than those subject to the proposed Amendment.  (*Id*. at 22-24).  Further, there is no evidence to support the commenters' theory that the groundwater system is changing and that new springs or seeps might appear in the future.  (*Id*. at 46-48, 75).  While it is possible that there have been local changes in the discharge point of the groundwater system at Neal's Landfill, the proposed Amendment requires CBS to build a new collection system several hundred feet downstream from the springs and seeps, thereby expanding the collection zone to accommodate any minor changes in the discharge point in the groundwater system.

### b.      Commenters' Proposed Remedy

Some commenters have suggested that the EPA should require excavation of the bedrock to remove a portion of the mass of PCBs that will otherwise remain in the bedrock for an indeterminate time.  The EPA has determined, however, that the PCBs in the bedrock do not pose a threat to human health or the environment unless and until they migrate to nearby streams.  Thus, from the standpoint of protecting human health and the

27

environment, the excavation of the bedrock does not offer any significant advantages over the containment remedies selected by the EPA. Further, excavation alone would not fully protect human health or the environment. Despite years of investigation, the main conduits in the bedrock through which PCBs migrate have not been discovered. Even if discovered, it is highly unlikely that PCBs could be effectively cleaned from every crack and fissure where they may have come to reside over the past 50 years since they were dumped at the Remaining Sites. Thus, excavation of the bedrock would not obviate the need for water treatment plants.

Moreover, excavation of the bedrock poses technical challenges, in that high concentrations of PCBs are located beneath a railroad track and cemetery. (*Id*. at 68). Excavation beneath such obstacles would be difficult and would almost certainly arouse objections from some members of the public. Further, even if these obstacles could be overcome, CBS would need to jackhammer through more than sixty feet of bedrock to reach the area where PCBs are known to reside. (*Id*. at 68). Such work would generate significant amounts of dust and could create a new risk to local residents from volatilizing PCBs.

Finally, excavation of the bedrock would be enormously expensive. In selecting the source control operable units, the EPA estimated that the cost of fully excavating Lemon Lane Landfill and Neal's Landfill would be $54.35 million and $80.24 million respectively (the cost does not include excavating into the bedrock). (*Id*. at 62-63). The

28

EPA estimates that it would cost nearly $270 million to excavate the bedrock below the Remaining Sites.  (*Id*. at 62-64) (estimating $108 million to excavate the bedrock at Lemon Lane Landfill and $160 million to do the same at Neal's Landfill).  While even such extremely high costs do not automatically disqualify a remedial action, cost is certainly an appropriate balancing factor (40 C.F.R. § 300.430(e)(7)(iii)) and can weigh heavily where, as here, the high cost alternative's comparative benefits and feasibility are doubtful at best.

For the reasons set forth above, the court finds the proposed Amendment is technically adequate to accomplish the goal of cleaning the environment in and around the Remaining Sites.  The court further finds that EPA's containment remedy is superior to the commenters' proposed remedial alternative.

### 3.  The Proposed Amendment Reflects the Strengths and Weaknesses of the Government Plaintiffs' Case Against CBS

The proposed Amendment reflects the strengths and weaknesses of the parties' positions in light of the terms of the Original Consent Decree and the circumstances which prevented implementation of that agreement.  The Original Consent Decree provided CBS with a "Covenant Not to Sue" protecting it from environmental claims relating to the sites, subject to certain specific reservation of rights.  This protection extended to all of the types of claims that are now the subject of this settlement – namely, claims for additional response actions, the reimbursement of response costs, and natural

29

resource damages.  Thus, absent a settlement, Plaintiffs' ability to pursue these claims would be extraordinarily difficult.

Under its reservations to the "Covenant Not to Sue" in the Original Consent Decree, the United States has the right to assert claims against CBS for injunctive relief or response costs (but not for natural resource damages) where such claims arise from an unknown or unforeseen condition at the site.  To rely on this reservation, the United States would have to demonstrate that the ongoing releases from seeps and springs at the Remaining Sites, or their hydrogeologic connections to the contaminated groundwater at these sites, were an unknown or unforeseen condition in 1985.  In response to such arguments, CBS would point to certain documents and information in the public record at the time, which CBS would argue demonstrate that these conditions were foreseen or even actually known at the time the "Covenant Not to Sue" was given to CBS in the Original Consent Decree.

In the alternative, the United States could assert all of its claims against CBS, including its claim for natural resource damages, if it could successfully satisfy the requirements for voiding the "Covenant Not to Sue" with respect to the Remaining Sites. To prevail, the United States would have to show that CBS failed to perform its obligations under the Original Consent Decree.  CBS, of course, would argue to the contrary.

These are just a few examples of the complexities raised by this litigation. The court finds that the Plaintiffs, and the public, are far better served by the proposed Amendment. By requiring CBS to perform the amended remedies selected by EPA for the Remaining Sites, the proposed Amendment fully satisfies Plaintiffs' remedial objectives, while compromising a portion of Plaintiffs' claim for recovery of response costs, as well as compromising various counterclaims that could have been asserted by CBS. In light of the complexities and risks associated with litigation, not to mention the substantial delay in the cleanup of the site if litigation were to continue, the proposed compromise of response costs and natural resource damages is reasonable.

### D.    The Proposed Amendment is Consistent with Applicable Law and the Public Interest

The purpose of CERCLA is (1) to "abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites," and (2) to "shift the costs of cleanup to the parties responsible for the contamination." *Metro. Water Reclamation Dist. v. North Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007). The court finds the proposed Amendment will advance both goals. It provides for CBS to assume responsibility for the Remaining Sites, and for CBS to reimburse the United States for a significant portion of EPA's past response costs. In addition, the proposed Amendment will generate funding for restoring and replacing natural resource damages by PCBs, as well as providing for CBS to reimburse the United States for a significant

portion of the Department of Interior's assessment costs.

The proposed Amendment is also in the public interest.  The implementation of the proposed Amendment will protect human health and the environment from released hazardous substances without further expenditure of limited Superfund resources, while at the same time reimbursing a portion of past Superfund expenditures which can be used to fund cleanups at other sites.  The settlement will also allow implementation of the final remedial actions to begin immediately, whereas litigation would result in delay for an unknown, but lengthy, period of time and would impose significant burdens on the resources of all parties and the court.

## V.    Conclusion

The court finds that the parties' proposed Amendment to the Consent Decree is procedurally and substantively fair, its terms are reasonable and adequate, and it is consistent with the goals and purposes of CERCLA.  The United States' Motion to Enter the Agreed Amendment to the Consent Decree Providing for Remedial Actions at Neal's Landfill, Lemon Lane Landfill, and Bennett's Dump is therefore **GRANTED** (Docket # 40).  The proposed Amendment will be entered and effective as of the date of this Order.

**SO ORDERED** this <u>23rd</u> day of July 2009.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

David R. Berz
WEIL GOTSHAL & MANGES LLP
david.hird@weil.com

Daniel R. Dertke
UNITED STATES DEPARTMENT OF JUSTICE
daniel.dertke@usdoj.gov

Geoffrey Mitchell Grodner
MALLOR CLENDENING GRODNER & BOHRER
gmgrodne@mcgb.com

David B. Hird
WEIL GOTSHAL & MANGES LLP
david.hird@weil.com

Rudolph William Savich
rsavich@aol.com

William Kent Steger
MONROE COUNTY ATTORNEY
wsteger@co.monroe.in.us

Valerie Marie Tachtiris
INDIANA OFFICE OF THE ATTORNEY GENERAL
vtachtiris@atg.state.in.us

Brent D. Taylor
BAKER & DANIELS
bdtaylor@bakerd.com

Joseph William Chinn Warren
UNITED STATES DEPARTMENT OF JUSTICE
joseph.warren@usdoj.gov